68 So.2d 553 (1953)
KANTER et ux.
v.
SAFRAN et al.
Supreme Court of Florida, Special Division B.
September 15, 1953.
Rehearing Denied December 17, 1953.
*555 Kanter & Marks, Miami, and Weldon G. Starry, Tallahassee, for appellants.
Sibley & Davis, Miami Beach, for appellees.
ROBERTS, Chief Justice.
This is a lease controversy arising in the Dade County area, the factual background of which is as follows:
The appellants are the lessors and the appellees (lessees hereafter) are the assignees of a lease of certain hotel property in Miami Beach. The lease, dated March 1, 1950, was for a five-year term at a total rental price of $169,000, averaging $33,000 per year. The original lessees made a security deposit of $33,000 at the beginning of the term, in accordance with the provisions of the lease. The lessees (appellees here) went into possession of the premises under their assignment of lease on October 11, 1950. They failed to pay rental payments of $5,000 each due on March 1 and April 1, 1952; and on June 10, 1952, the lessors filed suit at law to collect this past-due rent. Thereafter, on June 30, 1952, and prior to the time that judgment was entered in the law suit, the lessees wrote to the lessors that on July 7, 1952, they would "relinquish possession of said premises" and turn over the keys thereof to the lessors.
On July 3, 1952, the lessors wrote the lessees in acknowledgment of their letter of June 30, in the following terms: "We herewith refuse and shall continue to refuse to accept any relinquishment or surrender by you or your agent or assigns of the premises above mentioned, and in the event your conduct necessitates our re-entering or retaking possession of the premises above mentioned, any such re-entry or retaking shall be for and on your account and we shall hold you in general damages for the difference between the rentals stipulated to be paid, and what, in good faith, we are able to recover from a re-letting."
The parties then met at the hotel premises on July 7th, checked the inventory of the hotel furnishings, and the lessors accepted the keys to the premises.
On August 1, 1952, just three weeks later, the lessees filed the instant suit in equity for a declaration of their rights under the lease and as to the security deposit. They prayed that the court "cancel, void, and annul said lease by reason of the relinquishment made and accepted pursuant to the terms thereof"; that the court enjoin the prosecution of the suit at law filed by the lessors for the past-due rent; and that the court "establish that the $33,000 now held by the defendants is held for the account of the plaintiffs" and that, after deducting therefrom any rental found due by the lessees, the court enter a money decree in favor of the lessees for the balance thereof.
Their motion to dismiss having been denied, the lessors filed their answer, alleging inter alia that the security deposit under the terms of the lease constituted an agreement for liquidated damages to be retained by the lessors; they denied the allegations of the bill as to their acceptance of the lessees' surrender, and specifically denied that they had "accepted full and complete possession and control of the premises"; they counterclaimed for certain special damages *556 in the amount of $16,000 alleged to have been suffered by reason of the lessees' abandonment of the lease, and prayed that the court decree that the security fund be retained by lessors as liquidated damages, that "the plaintiffs are liable to the defendants under the terms of the said lease" and that "this court take an accounting of the sums of money due the defendants from the plaintiffs."
The cause was heard by the Chancellor, who made no findings of fact but decreed only that "on the main case the equities are with the plaintiffs. On the defendants' counterclaim the equities are with the counterclaimant to the extent of certain damages set out below." He decreed that the security deposit of $33,000 be returned to the lessees, less the amount of the judgment for past-due rent, with interest, and less damages allowed to lessors in the amount of $2,735. His decree ordered the lessors to pay to the lessees forthwith the sum of $18,848. The lessors have appealed from this final decree.
The parties do not agree on the questions to be decided by this court. However, we think the key question in the case is whether there was a surrender by the lessees and an acceptance thereof by the lessors in such manner as to terminate all further liability of the lessees to the lessors under the lease. And since there appears to be some confusion as to the basic principles of law respecting a "surrender" in lease law, we deem it wise to re-state these principles.
First, it should be noted that a "surrender" in the sense in which we are presently discussing it, is not merely a surrender of the leasehold premises; it is a surrender of the leasehold estate. Lord Coke defines a surrender as "a yielding up of an estate for life or years to him that hath an immediate estate in reversion or remainder, wherein the estate for life or years may drown by mutual agreement between them." See Kottler v. New York Bargain House, 242 N.Y. 28, 150 N.E. 591; Tiffany on Landlord and Tenant (1910) Section 187.
It is also important to note the distinction between an "express surrender" and a surrender "by operation of law."
An express surrender is purely contractual, and we look to the agreement to find the intent of the parties. Thomas v. Roth, Mo. App., 157 S.W.2d 250. Unless both the lessor and the lessee mutually agree, there can be no surrender by agreement of the parties. O'Neal v. Bainbridge, 94 Kan. 518, 146 P. 1165.
A surrender by operation of law is based somewhat on the principles of estoppel, in that a surrender is implied where the lessor has been a party to some act or acts incompatible with the continued existence of the relation of landlord and tenant. See Tiffany, Landlord and Tenant (1910), Sec. 190; Thomas v. Roth, supra; Christenson v. Ohrman, 159 Kan. 565, 156 P.2d 848; Continental Bank & Trust Co. of N.Y. v. Goodner, Sup., 49 N.Y.S.2d 747.
Thus, a surrender by operation of law occurs when the tenant accepts from the landlord a new lease inconsistent with the old lease, or accepts a different class of interest in the premises inconsistent with such lease. A surrender by operation of law may also result from the relinquishment of possession by the lessee and the resumption of possession by the lessor. But whether such a surrender will be implied must depend on the facts of each particular case. As stated by Tiffany in his work on Landlord and Tenant, at page 1335:
"The fact that the landlord enters and cares for the premises after the tenant's abandonment is not regarded as showing a resumption of exclusive possession, effecting a surrender, nor does the making of repairs in itself have that effect. The question is whether the possession taken by him is of an exclusive character, with the apparent intention of occupying and controlling the premises as his own, to the exclusion of the tenant, in case the latter desires to return, and this is ordinarily a question of fact."
*557 The authorities are not in accord on the question of whether a reletting by the landlord after the abandonment or relinquishment of the premises by the tenant will effect a surrender by operation of law. For a discussion of the various views on this question, see 32 Am.Jur., Landlord and Tenant, Sec. 519, page 423; 52 C.J.S., Landlord and Tenant, § 498, page 278.
But it is clear that a surrender by operation of law will not be implied where such was manifestly not the intent of the parties. "When such intention cannot be presumed without doing violence to common sense, the presumption will not be supported." Christenson v. Ohrman, supra [159 Kan. 565, 156 P.2d 851]. Thus, the parties may so contract in their lease agreement as to make the implication untenable, Continental Bank & Trust Co. of N.Y. v. Goodner, supra; Brill v. Haifetz, 158 Pa.Super. 158, 44 A.2d 311; Crow v. Kaupp, Mo.Sup., 50 S.W.2d 995, as where the lease specifically provides that the lessor may re-enter and re-let for the account of the lessee. And, clearly, there can be no presumption of an acceptance of a surrender when the lessor accepts the keys and resumes possession of the premises, qualifiedly and conditionally. Thus, as stated by Tiffany, Landlord and Tenant (1910), at page 1337: "The fact that the landlord, at the time of obtaining or accepting control of the key, or previously thereto, states or explicitly shows that he has no intention of regarding the tenancy as terminated, or of releasing the tenant from his obligations under the lease, is sufficient of itself to prevent such result." See also McAdam, Landlord and Tenant, 5th Ed., page 1378; Hulsey v. Harrington, 57 Ga. App. 479, 195 S.E. 901; Richman v. Joray Corp., 4 Cir., 183 F.2d 667; Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 137 A.L.R. 420.
Some mention should also be made of the lessee's liability in damages to the lessor under the circumstances which we are here discussing. Of course, the parties may mutually agree to a surrender and acceptance of the leasehold estate without further liability on the part of the lessee, in which event there can be no recovery by the lessor of damages for the loss of future rents nor for any damages other than those existing at the time of the termination of the lease agreement. And, as heretofore noted, the lessor may accept the surrender of the premises and thereafter re-enter and relet on the account of the lessee, either by virtue of a stipulation to that effect in the lease or on the basis of such a qualification or condition expressly or impliedly attached to the lessor's acceptance of the lessee's surrender of the premises. It has been held that in these circumstances, there has been no determination of the leasehold estate, that the lease term is still in existence, and that the claim by the lessor for the difference between the amount received on a reletting and the amount stipulated in the lease is a claim for rent rather than for damages. See Kottler v. New York Bargain House, 242 N.Y. 28, 150 N.E. 591; Dorcich v. Time Oil Co., 103 Cal. App.2d 677, 230 P.2d 10; Wukasch v. Hoover, Tex Civ.App., 247 S.W.2d 593. Other decisions seem to be based on the fact that a reletting in such circumstances is merely in mitigation of damages  that the leasehold estate is ended and that the contract remains alive only for the purpose of measuring the damages, and that the lessor's claim for the difference between the amount received on the reletting and the amount stipulated in the contract is one for damages rather than for rent. See Crow v. Kaupp, Mo.Sup., 50 S.W.2d 995; Shea v. Leonis, 29 Cal. App.2d 184, 84 P.2d 277; Brill v. Haifetz, supra; Weinsklar Realty Co. v. Dooley, 200 Wis. 412, 228 N.W. 515, 67 A.L.R. 875; Marathon Oil Co. v. Edwards, Tex.Civ.App., 96 S.W.2d 551; Stewart v. Kuskin & Rotberg, Inc., Tex.Civ.App., 106 S.W.2d 1074; Lips v. Opp, 150 Kan. 745, 96 P.2d 865; Carey v. Hejke, 119 N.J.L. 594, 197 A. 652; Friedman v. Colonial Oil Co., 236 Iowa 140, 18 N.W.2d 196. See also Williams v. Aeroland Oil Company, 155 Fla. 114, 20 So.2d 346, 348, where this court stated that the claim would be for "general damages for the difference between the rentals stipulated to be paid and what, in good faith, the landlord is able to recover from a reletting". In those jurisdictions where it is held that the claim *558 is for damages not for rent, the lessee "is not in position, after having violated his lease by abandoning the premises, to turn that breach into gain for himself by asserting a claim to the excess of the rental obtained on the reletting above that provided in his lease." 32 Am.Jur., Landlord and Tenant, Sec. 520, page 427.
But we do not conceive that, upon a "relinquishment" or abandonment of the leasehold premises by the lessee under such circumstances as to amount to a repudiation of the lease agreement, the lessor is required to relet the premises for the account of the lessee in order to preserve his right to general damages for the loss of future rents. As indicated in Williams v. Aeroland Oil Co., supra, there is authority for the proposition that when a lessee repudiates his contract, a cause of action immediately arises in favor of the lessor for full damages, present and prospective, which were the necessary and direct result of the breach, the measure of which is the difference (reduced to present worth) between the rent fixed in the lease and the present fair rental value of the premises for the remainder of the term, together with such special damages as may have resulted from the breach. This is simply an application to lease contracts of the doctrine of "anticipatory breach" in general contract law, the reason for which is fully explained in Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 137 A.L.R. 420. See also Hyman v. Cohen, Fla., 73 So.2d 393, and cases cited therein; 51 C.J.S., Landlord and Tenant, § 250, page 883; Wukasch v. Hoover, Tex.Civ.App., 247 S.W.2d 593.
And where, as here, a lease agreement contains mutually dependent executory covenants to be performed on either side, there would appear to be no valid reason for refusing to apply the doctrine of anticipatory breach to a repudiation of the contract by the lessee. In such event, the lessor has a right to consider the contract ended insofar as further performance by the lessee of its terms is concerned and may resume possession of the leasehold premises; but he may refuse to accept the surrender of the leasehold estate insofar as his right to recover damages for the breach is concerned. Where such right is preserved, the lessor's intention in resuming possession of the premises (whether on his own account or for the account of the lessee) is important only to a determination of the time at which he intends to collect for his damages for the total breach of the contract. He may resume possession on his own account and sue immediately for his damages, the measure of which is as noted above; or he may resume possession of the premises and relet for the account of the lessee and, at the end of the term, collect the difference between the amount received on the reletting and the amount stipulated in the lease agreement for the remainder of the term. In either case, the lessor is entitled to recover for any special damages chargeable against the lessee and, in the latter case, for the expenses reasonably necessary in order to obtain a tenant and mitigate damages under the lease. C.D. Stimson Co. v. Porter, 10 Cir., 195 F.2d 410. For the measure of damages for the breach of a long-term lease, see Hawkinson v. Johnston, supra, and the annotation in 85 L.Ed. at page 352.
Since most of the lease cases arising in the Dade County area involve a deposit made by the lessee with the lessor upon the execution of the lease, the question immediately arises as to the respective rights of the parties in and to this deposit under the circumstances we are here discussing.
If the parties have made a valid stipulation for the forfeiture of the deposit as liquidated damages for loss of future rents upon the termination of the lease by the lessor for the default of the lessee  which will include the lessee's wrongful abandonment and repudiation of the lease  then the lessee cannot recover any portion of the sum deposited when the lessor elects to treat the lessee's repudiation as a "total breach" and resume possession on his own account. Similarly, the lessor is bound by the stipulation for liquidated damages for the items specified therein, and cannot sue *559 for any excess over the stipulated amount. It should be noted that, in the absence of an express stipulation, it will not be presumed that "liquidated damages" include rents which have accrued at the time the lease is terminated, since such are capable of exact ascertainment at any time the forfeiture might be declared. They are, moreover, in the nature of a debt, rather than damages, which have been defined as "the pecuniary compensation, recompense or satisfaction for an injury sustained." 8 R.C.L. 420, cited in Smith v. Navarro, Tex.Civ.App., 69 S.W.2d 794, in which this same conclusion was reached.
If, however, the provision for the forfeiture of the deposit cannot be upheld as a stipulation for liquidated damages and is held to be a stipulation for a penalty, then the lessee can recover only that portion remaining after deducting the lessor's actual damages, including damages for loss of future rents if the deposit was intended to secure such loss. And if the lessor has resumed possession and re-let the premises for the account of the lessee, then the lessee has no cause of action for the recovery of the balance of the deposit, if a penalty, until the end of the term, for it is not until then that the damages are finally ascertainable. Rasch, Landlord and Tenant, 1950 Ed., page 602.
With the foregoing principles of law in mind, we will turn to the facts in the instant case.
As mentioned before, the lessees in the instant case notified the lessors that they would "relinquish" possession of the premises on a day certain; and, prior to that certain date, the lessors advised the lessees that they refused to accept such relinquishment or surrender and that any re-entry or retaking would be for the account of the lessees. They explicitly stated that they would hold the lessees "in general damages for the difference between the rentals stipulated to be paid, and what, in good faith, [they] are able to recover from a reletting." When the lessees, with such notice, persisted in their "relinquishment" of the premises, they must be held to have impliedly agreed to a reletting on their account, within the rule stated by McAdam, in his Landlord and Tenant, 5th Ed., page 1380, that "To create a contract by implication there must be an unequivocal and unqualified assertion of a right by one of the parties, and such silence by the other as to support the legal inference of his acquiescence."
There can be no question here, then, of a surrender by operation of law, since the lessor's resumption of possession was upon an express condition that was impliedly agreed to by the lessees. The surrender here is an "express surrender," and the only question is whether the conduct of the lessors after resuming possession of the premises was such as to evidence an election to renounce the privilege of reletting for the account of the lessees and operate the premises for their own exclusive use and benefit.
The evidence showed that, after accepting the keys to the premises, the lessors retained some of the employees of the hotel and advised sub-tenants then in the hotel that they could remain as long as they wanted to do so; that the utility deposits were transferred from the name of the lessees to that of the lessors; that one insurance policy was transferred to the lessors, and the others were cancelled. It was also uncontradicted that the lessors, late in August (subsequent to the filing of the instant suit), began to make repairs to the property and replacements of various furnishings, and that substantial alterations in the elevator system were made. Alterations were made in the premises, consisting in the removal of a wall between the lobby and a bedroom to enlarge the lobby, which decreased the number of bedrooms in the premises from 60 to 59.
There was a conflict in the evidence as to whether the lessors intended to relet the premises. The lessees' evidence was to the effect that the lessor Kanter stated that the premises were not for lease and that, upon being approached with reference to a sale of the premises, he gave a figure for which he would consider a sale. It is not contended by the lessees, however, that the lessor *560 Kanter took the initiative in listing the property for sale. Kanter, on the other hand, testified that he had listed the property for lease and filed in evidence several letters in response to such listing, but that these offers were rejected because they were too low. Kanter also testified that the interior of the hotel and the furnishings were in very bad condition at the time of the relinquishment, and that it was necessary to make the repairs in order to obtain a good tenant.
The lessees also showed that a sign was posted outside the hotel premises, stating that the hotel would re-open for business on November 1st, with "ownership-management". Kanter admitted knowledge of this sign, but testified that the sign had been erected by the decorators without his permission. Kanter testified that he planned to lease the hotel as soon as he could obtain an adequate rental offer and that he would operate it himself until he could do so.
In the absence of an agreement to the contrary, the foregoing evidence would be sufficient to sustain the lessees' contention that there had been a surrender "by operation of law" of the leasehold estate, since the possession taken by the lessors could validly be interpreted as "of an exclusive character, with the apparent intention of occupying and controlling the premises as [their] own, to the exclusion of the tenant, in case the latter desires to return * *." But as we have heretofore noted, the question here is not whether there was a surrender by operation of law; the question is whether the lessors have elected to renounce their declared intention to re-let for the account of the lessees.
None of the repairs of refurnishings made by the lessors is inconsistent with the right of the lessors to re-let for the lessees' account. They were all acts for the benefit of the lessees and in their interest  particularly in view of the testimony of one of the lessees that they had tried without success for a year to make a sub-lease of the premises. It is the same with the alterations in the elevator service, since the same witness testified that the previous elevator service was completely inadequate and the source of much trouble during their occupancy of the premises. Nor is the fact that the lessors removed a partition and reduced the number of the rooms inconsistent with such an intention. See Brill v. Haifetz, 158 Pa.Super. 158, 44 A.2d 311. This is not to say that the lessors could recover from the lessees, as special damages, the cost of improvements of a substantial and permanent nature, such as the elevator alterations and remodeling, compare C.D. Stimson Co. v. Porter, 10 Cir., 195 F.2d 410; we say merely that they are not conclusive here on the question of the lessors' intention.
This leaves only the conflicting evidence as to the lessors' intention with respect to the leasehold premises. The Chancellor made no findings of fact, but we assume that he chose to believe the testimony of the lessees' witnesses that (1) the lessors did not plan to re-lease the premises but would operate the hotel themselves in order to give the son-in-law of the lessor Kanter something to do, and (2) the lessor Kanter gave a listing on the hotel property for sale, when approached by a real estate broker, on terms which the broker testified were "ridiculous." This witness testified, also, however, that the lessor Kanter later told him that the hotel "was off the market. He was going to run it himself."
The lessor Kanter admitted in his testimony that he would operate the hotel himself until he could find a good lease for the property; but this is not incompatible with an intention eventually to lease for the account of the lessees. In Lenco, Inc., v. Hirschfeld, 247 N.Y. 44, 159 N.E. 718, 720, under a stipulation for reletting contained in the lease, the lessor re-entered and operated the leased premises  a hotel  for two years before reletting. In a suit by the lessee to recover his security deposit, the question was whether the reletting was for the account of the lessee or on the lessor's own account. The court said: "* * * there is a duty on the landlord to exercise his option with reasonable celerity. In that view unnecessary delay may be evidence of an election to renounce the privilege of reletting and remain the occupant himself. *561 * * * Even if this be so, there is no duty, while endeavoring to relet, to leave the premises in idleness, thereby destroying the good will, and aggravating the loss. We are to remember that, after re-entry for breach of a condition, the landlord in reletting is not an agent in a true sense, since the term is at an end. * * * He is merely using a prescribed method to ascertain the damage. * * * The tenant does not dispute the landlord's statement that there was diligent effort to relet at the best rent to be obtained. A building so considerable cannot be leased over night. Nothing in the record justifies the conclusion that the option to relet was extinguished or abandoned." While the Lenco case involved a re-entry by the landlord upon condition broken by the lessee, the situation is analogous to a re-entry by a landlord after the abandonment by the lessee and a reletting on the lessee's account in those states which hold that the action at the end of the term is for damages and not for rent, as heretofore noted.
We think, then, that a three-weeks delay (which is the time that had expired at the time of the filing of the instant suit) is certainly not an "unnecessary delay" in finding a new tenant; nor is a delay of three months (which is the time that had expired at the time of the trial) such an unnecessary delay; in fact, it is hardly enough in which to repair and recondition the premises in order to obtain a new tenant at the best possible rental. As mentioned before, none of the lessors' actions taken prior to the time of the trial was incompatible with his announced intention to relet for the account of the lessees. The only basis, then, for a conclusion that the lessors had renounced their right to do so is the evidence that the lessor Kanter had stated that he had no intention of reletting and was planning to let his son-in-law operate the hotel. As mentioned before, this evidence was contradicted by that of the lessors, substantiated by letters from prospective lessees submitting bids for leasing the hotel, which were filed in evidence. In our opinion, the lessees' evidence, without more, is insufficient as a basis for holding that the lessees have carried their burden of proving an abandonment of such right. While we are reluctant to disagree with a Chancellor on a question of fact, we are less hesitant here because we feel that he may have predicated his decree on a decision of the question of whether there had been a surrender by operation of law, rather than on the real question of whether the lessors had abandoned their right to relet. Undoubtedly, additional facts have developed since the trial of the cause which will show conclusively whether the lessors have abandoned their right to relet for the account of the lessees, and we think the ends of justice will be best served by requiring the lessees to produce such additional facts, if they desire to do so.
While not necessary to a decision of the particular question upon which this appeal turns, it is important to the parties in the event they desire to proceed further in this cause to have answered the question of whether the sum deposited by the lessees upon the execution of the lease and the provision for its forfeiture was a stipulation for liquidated damages or for a penalty.
The lease provided that the deposit was "to stand as a guarantee and as security for the performance by the lessee of all the terms, conditions, covenants, and agreements in this lease contained and to be kept and performed by the lessee as well as security for the rent" and also "to indemnify the lessors against any damages to the said premises both real and personal and for any damages sustained by the lessors or for any action or breach or default in the lease by by the lessee."
The lease also contained a provision for the forfeiture of the deposit upon termination of the lease by the lessors in the following terms: "(a) If the lease is cancelled through default of the lessee no part of the fund shall ever be returned by the lessors unto the lessee nor shall the lessors be bound to account to the lessee for any part of the said fund. (b) Upon such cancellation for default in addition to retaining the security fund as liquidated and agreed upon damages the lessors may call upon the lessee to respond for any existing damages, should the actual damages exceed the *562 amount of the security fund excepting, however, that in computing the damages the same shall take into account only damage to the property both real and personal and arrearages in rent for any periods of time during which the lessee is actually in possession. In the event that the lessee relinquish possession at any time during the term of this lease they shall not be liable for any rents accruing after the relinquishment of possession by them."
It was also provided that no interest was to be paid on the security deposit and that it need not be kept by the lessors in a separate account. Provision was made for the return of the deposit to the lessees during the last year of the rental period, but not as rent.
It is apparent that the parties to the lease agreement in the instant case did not intend to liquidate their damages by stipulating for the forfeiture of the deposit upon cancellation of the lease by the lessor for the default of the lessee.
Paragraph (b), supra, expressly states that the lessors "may call upon the lessee to respond for any existing damages, should the actual damages exceed the amount of the security fund * * *." Under such circumstances, the provision for forfeiture cannot be sustained as a provision for liquidated damages. See Stenor, Inc., v. Lester, Fla., 58 So.2d 673.
For the reasons hereinabove stated, it must be held that the lower court erred in requiring the lessors to return to the lessees the balance of the security deposit over and above the past-due rent, since  the lessees having failed to prove that the lessors had abandoned their right to relet for the account of the lessees  the lessees' action was premature. We feel that sufficient time has now elapsed, however, to make the lessors' intention abundantly clear and that, rather than ordering the lower court to dismiss the lessees' suit, the ends of justice will be best served by directing the Chancellor to allow the parties to adduce such additional testimony as they may desire on the basis of such amendatory or supplemental pleadings as they may wish to file, and thereafter to enter a decree not inconsistent with the opinions herein expressed.
Accordingly, the decree is reversed and remanded with the directions hereinabove expressed.
HOBSON, MATHEWS and BUFORD, JJ., concur.