### CITY OF ORLANDO v. MURPHY.
No. 8048.

Circuit Court of Appeals, Fifth Circuit.
June 15, 1936.
Rehearing Denied July 20, 1936.

532

George P. Garrett, W. H. Poe, W. L. Tilden, and Merton S. Horrell, all of Orlando, Fla., for appellant.

J. Thomas Gurney, of Orlando, Fla., and Thos. B. Adams and Louis Kurz, both of Jacksonville, Fla., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

This was a suit for damages in the sum of $800,000 resulting, as alleged, from the breach of a contract with reference to an extensive paving program contemplated for certain streets in the city of Orlando, Fla. It was filed against the city by the appellee, as assignee of the contractors. The declaration was in nine counts. After a demurrer based on twenty-seven grounds was overruled, pleas were filed in sets; the first consisting of thirty pleas, the second of two dozen, and yet another of thirteen. Sets of pleas were met by demurrers and motions to strike, and, finally, the issues remaining were submitted to a jury, which returned a verdict for the plaintiff. Upon appeal by the city, the petition therefor contained two hundred and forty-four assignments of error, which have been classified and reduced in this court to twenty-four specifications. As we think the case turns upon a construction of the contract, we shall state in our own way the essential facts upon which our decision is based without attempting to deal separately with the numerous assignments argued by the parties. In so doing, we shall assume the validity of the contract, although it is assailed by the city on the ground of ultra vires, (1) because the assessment should be against the abutting property and not upon the abutting property owners, and (2) because, before the total costs of the improvement can legally be assessed against the abutting property, there must be a determination by the city council of the benefits to the particular property. Citing Atlantic Coast Line R. Co. v. City of Lakeland, 94 Fla. 347, 115 So. 669; Brown v. City of St. Petersburg, 111 Fla. 718, 153 So. 140, 141. A decision of these questions is unnecessary in view of the construction we have placed upon the contract. Owing to the course of the pleadings, we shall also pretermit rulings upon several other questions raised in the briefs.

The contract was made on October 10, 1925, under authority of an Act of the Legis-

lature of the State of Florida, the principal purpose of which was to provide an additional method of financing local improvements by the city of Orlando. Chapter 10974 (No. 952), Laws of Florida, Special Acts of 1925, vol. 2, pp. 3468-3478. Under the act, the city was authorized to make improvements to its streets and alleys, to be paid for, wholly or in part, by the property owners thereby benefited. It was authorized to issue bonds to an amount not exceeding 70 per centum of the estimated cost, pledging its faith and credit for the payment of the bonds; the amount of the costs to be raised by special assessments against the property. In the event these assessments were not collected sufficiently to pay the principal and interest on the bonds, the amount thereof was to be levied and collected as a general tax, provided the aggregate of bonds payable by general taxation should not exceed the amount of the unpaid assessments. The act permitted a sale of the bonds, but provided that they should not be delivered except as the work progressed (section 1). Originally the bonds could be sold at not less than par (section 7), but subsequently the act was amended to allow their sale at 95 cents on the dollar (Acts Fla.1925 Ex. Sess., c. 11661, § 2). The proceeds derived from the sale of the bonds and from the prompt payment of all special assessments were to constitute a fund for the payment of any contract made under the act, and said fund was to be used to pay for the work as it progressed, was completed, and accepted.

Proceeding under authority of the act, the city council of Orlando, on August 15, 1925, adopted a resolution that it was to the best interests of the city to make the improvements mentioned therein; instructed the clerk to advertise for bids from contractors for the work and materials; and provided that the improvements be made wholly at the cost of the property owners thereby benefited. Advertisement having been made, the council voted to award a contract to Murphy & Prior, assignor of appellee, for the construction of paving, curbing, and gutters at an estimated cost of $2,769,881.50. On October 10, 1925, the council approved the form of the contract to be made, and authorized the mayor and clerk to execute the same, which was done. On October 14, by resolution, the council estimated the total cost of the improvements to be covered by the contract at $2,927,000, and provided that all of said amount be assessed against the property benefited by the im-

provements. On November 24, 1925, in a proceeding instituted for that purpose, a final decree was entered validating the issuance of $2,050,000 of bonds, or 70 per centum of the estimated total cost. Under the law, the remaining bonds (30 per cent.) necessary to pay the cost were to be issued upon "final completion" of the work, less the amount of such special assessments as had been levied and collected in the meantime. The aggregate of the bonds for which the full faith and credit of the city might be pledged was expressly forbidden to exceed the amount of the unpaid assessments. Other debts to be paid by general taxation were not authorized by the act. In order that benefits and bonded indebtedness should proceed pari passu, it was provided that bonds should not be delivered except as the work progressed. Section 1.

By the terms of the contract thus entered into, the city agreed to pay 85 per cent. of the value of the completed work and materials furnished by the contractors, reserving 15 per cent. as partial security for the faithful performance of the contract. The supervision of the execution of the contract was vested wholly in the city engineer, who was authorized to increase or decrease the approximate quantities of work and materials, given in the instructions to bidders, which were stipulated in the contract to be merely for the comparison of bids. If such alterations increased or diminished the quantities, the contract rates were to be paid for the actual quantities used. The contractors agreed to furnish and deliver all materials, and to do and perform all the work, in strict conformity to the specifications which were made a part of the contract. They were to commence work within four weeks from the date thereof and to prosecute it diligently without avoidable interruption so as to complete the program within the period of two years named in the proposal. A failure in this respect gave the city the option to abrogate the contract. If the work were not finished within the time named, the contractors would forfeit to the city from the final payment of 15 per cent. such reasonable engineering expenses as were incurred by reason of the delay. In case of delay attributable to any act or neglect of the city, the period allowed to do the work was extended for a corresponding length of time. The duty to indicate the points of beginning and order of procedure of the work, so as to keep the contractors fully employed, was devolved upon the engineer, who was also requir-

ed to determine the amount, quality, and acceptability of the work and materials, and to determine all questions or differences of opinion that might arise as to the interpretation of the plans and specifications. The plans and drawings prepared by the engineer "for the work when contemplated," or which might thereafter be prepared in accordance with the agreement, "showing more particularly the work to be done," were stipulated to be the controlling part of the contract.

Under the special legislative act above mentioned and pursuant to the contract, a large amount of bonds was sold, the engineer designated many streets to be paved, brick and material were ordered for this purpose, and the contractors performed the work whereby the greater portion of the contemplated paving was completed, and for which they were paid about $2,000,000. There were numerous delays, most of which were caused by lack of funds due to the inability of the city to sell the bonds and collect the special assessments.

On February 25, 1929, Murphy & Prior dissolved partnership; Prior assigning his interest in the contract to Murphy, who notified the city and proceeded with such work as was designated; the city raising no objection to the assignment at that time. In June, 1930, after about two-thirds of the work originally contemplated had been completed, the city abandoned its efforts to finance the program provided for in the contract; and, at the request of the contractor, released the principal and surety on the bond given thereunder. The contention is made that there was a mutual abandonment of the contract, but, under the pleadings, we do not pass on that question.

Upon this record, in view of the rulings by the court on the demurrer and otherwise, there can be no contention that the city did not make faithful and diligent effort to sell more bonds and collect additional assessments or that it was able to do so. In 1931, demand was made by the contractor to have further work designated under the contract, apparently with the view of obtaining a refusal upon which to predicate this action. Failing to obtain the designation of additional streets, appellee, on October 2, 1932, instituted this action for breach of the contract, made nearly eight years before that time.

The claim for damages submitted to the jury was (1) for a balance due on work done and materials furnished; (2) for anticipated profits on uncompleted paving, curbing, and excavation; (3) for loss on account of wrongful culling of brick by the engineer; (4) for loss on account of excessive premiums paid by reason of unnecessary delay attributable to the act or neglect of the city; and (5) for overhead expenses during unreasonable periods of delay caused by the city. Except that it allowed nothing for loss on account of wrongful culling of brick by the engineer (item 3), the jury found for the plaintiff on each item. The amounts awarded were as follows:

Item (1)......................$ 1,817.63,
Item (2)...................... 202,195.21,
Item (4)...................... 14,114.19,
Item (5)...................... 23,001.53,
　　　　Total .................$241,128.56,

with interest thereon at the rate of 8 per cent. per annum from July 14, 1932.

There is no complaint by appellant as to the finding of the jury under item 1, and no cross-appeal by appellee as to either items 1 or 3. Therefore, those two items may be dismissed from further discussion. The other amounts embraced in the verdict and judgment involve claims by appellee for damages for loss of anticipated profits on uncompleted work and for unnecessary expenses borne by the contractors during periods of unreasonable delay caused by the city or its engineer. The liability of appellant for damages of either character is challenged by assignments of error to the action of the court below both in overruling the defendant's demurrer to the declaration and in granting instructions to the jury on behalf of the plaintiff.

■ Where the parties, as alleged in the declaration in this case, have reduced their agreement to writing, questions as to the construction of the contract are usually for the court. It should receive that construction which will best effectuate the intention of the parties as expressed therein. This intention must be collected from the whole agreement; and, while the court will not undertake to make contracts for the parties, where an instrument is susceptible of two meanings, it will be given a reasonable rather than an unreasonable construction, and, when possible, a contract should receive such construction as will uphold it, rather than render it nugatory. Fed.Law of Contracts, c. 13.

■ It is not necessary to determine whether the city might have pledged its general credit for the completion of the entire

paving program, so as to become liable for damages of the character in controversy, because, after a careful examination, we find in the contract no covenant, guaranty, or warranty to that effect. Any such obligation could arise only expressly or by necessary implication. That no such promise was expressly made is beyond dispute merely from reading the written instrument; that none should be implied, except to the amount that bonds could be sold and assessments collected under the special act of 1925, above cited, is a reasonable conclusion deducible from the language employed in the contract and specifications, from the legislative act authorizing the project, from the circumstances under which the agreement was made, and from the practical construction given it by the parties during actual operations under it.

The resolution authorizing the letting of the contract provided that the entire costs should be paid through special assessments. Having entered into the contract under that resolution, both parties knew that the city was to raise the necessary funds under the terms of said act, and that the full amount was to be assessed against the property benefited, and paid from a fund to be supplied through the sale of bonds and the collection of assessments. This militates against the implication that anticipated profits were to be paid, if the failure to complete the program were due to lack of funds without fault on the part of the city; but this is not all; the contract itself, in section 22 of the specifications, says that payments shall be made as provided in said act of 1925, which we have seen provides, in section 17, that the proceeds derived from the sale of the bonds, together with collections on special assessments, "shall constitute a fund for the payment of any contract" made under the act. The bonds are expressly made a general obligation of the municipality, but there is nothing in the act or in the contract upon which to base the inference of a general obligation of the city to complete the work contemplated, if conditions beyond its control prevented the sale of its bonds and the collection of the assessments. The rational conclusion is that the city was under no obligation to continue operations when the money was exhausted which the parties intended should constitute a fund for the payment of the contract. The progress and completion of the work depended upon the existence of this fund, and it was not a breach or repudiation of the contract for the engineer to refrain from directing the contractors to proceed when to do so might bind the city to pay them out of its general fund; an obligation, perhaps, arising from the positive agreement to pay for completed work and materials which cannot reasonably be implied to support a claim for anticipated profits. A positive agreement to pay for completed work from a specific fund might imply a warranty of an adequate fund, whereas no implication of such a warranty could be based upon the implication of an agreement to pay anticipated profits. Furthermore, a common-law liability upon a quantum meruit or a quantum valebat often arises to pay for work performed or material furnished under a contract even though the executory portion is unenforceable. Independent Paving Co. v. City of Bay St. Louis (C.C.A.) 74 F.(2d) 961; City of New York v. Davis (C.C.A.) 7 F.(2d) 566, 573. However, we need not speculate upon what the result would have been if Murphy had proceeded to completion of the work with the city's consent and cooperation. That question is not presented, because it appears that, on account of financial difficulties the work was suspended from time to time, and, finally, when it became evident that no more money could be raised, the contractors quit work and the city canceled their bond. This conduct is consistent with the construction we have placed upon the contract.

These considerations lead to the conclusion that, when the contract was made, both parties contemplated it might be necessary to suspend or abandon operations if the special fund were depleted and could not be replenished. Assessments according to benefits cannot be collected to pay for anticipated profits on improvements not to be made, and it is unreasonable to infer that the parties contemplated anything of the kind. No doubt this thought influenced the bids and affected the profit made on the executed portion of the contract. The case of R. M. Grant & Co. v. City of Lake Worth (C.C.A.) 40 F.(2d) 579, 581, is not an authority to the contrary. In that case the suit was to recover for work actually done, and it was not necessary to determine whether the parties intended a recovery of anticipated profits to flow from a breach of the contract. The city bound itself to pay in money or bonds, and being unable to pay in bonds, the contractor had the right to collect in money. In the course of its opinion the court said: "If the city's obligation had been to pay through local assessments, the levy of valid assessments would have ex-

onerated it." See, also, 13 Corpus Juris, p. 631, § 701; Batchelder v. Prestman, 103 Fla. 852, 138 So. 473.

What has been said applies equally to the award by the jury of damages for delay, including extra amounts paid for bond premiums. After providing in the contract for liquidated damages equal to the additional engineering expense in case of delay through the fault of the contractors, and for an extension of time to complete the contract in case of delay on account of any act or neglect of the city (expressly juxtaposing their respective rights arising from delay), the parties, in section 12 of the specifications, further restricted the liability of the city for delay by the following provision: "Delays: No claims for damages shall be made against the City on account of delays in delivery of materials or performance of work; but should there be unduly prolonged delay in the delivery of any materials or the performance of work on the part of the City, the contractor shall be entitled to corresponding extension of time."

That the appellee has sought to utilize these provisions to keep the contract in force (the time for completion having been limited to two years) is shown from his demands in 1931 to have additional work designated. By these limitations in the contract and in the specifications, the parties have manifested an intention to restrict each other to the specific remedy mentioned. Since the sole recourse of the contractors for a delay by the city (whether short or unduly prolonged) was a corresponding extension of time, we think the claim for damages for delay, including extra bond premiums, should have been disallowed. Wells Bros. Co. v. United States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148; Wood v. United States, 258 U.S. 120, 42 S.Ct. 209, 66 L.Ed. 495.

Our conclusion is that no recovery of damages either for anticipated profits or for delay was allowable under the facts alleged in the declaration or shown by the evidence. The court disallowed the pleas based on portions of the contract, said to give the city the right to reduce the quantities of the work and materials, because filed too late. We make no rulings upon the assignments with reference to these provisions,[1] since the case seems to be disposed of otherwise, but in construing the contract we have given them due consideration in arriving at the intention of the parties. Therefore, the judgment of the District Court is affirmed as to items 1 and 3, but as to the others it is reversed and remanded for further proceedings not inconsistent with this opinion. Thorpe v. National City Bank of Tampa (C.C.A. 5) 274 F. 200; Gasoline Products Co., Inc., v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188.

---

[1] In the Contract.

The quantities of work and materials given in the instructions to bidders were approximate only and intended for the comparison of bids. The right is reserved for the Engineer to increase or decrease these quantities to such extent as he may find necessary for the proper completion of the work; if such alterations increase the quantities, the added work or materials will be paid for along with the original at the rate of stipulated work in the contract and subject to all the terms and conditions herein. If they diminish the quantities, the contract rates will still be paid for the actual quantities used.

In the Specifications

Quantities: The quantities named in the notice to Contractors, the form of proposal, or in these specifications, are approximate only. The City shall have the right to vary them, and if so varied, the total contract price shall be increased or diminished at the rates named per unit in the contract.

Changes in plans: The City shall have the right to make changes in plans. In making such changes, the unit prices named in the contract shall be used, as far as possible, in calculating the changes in price on account of changes in the plans, and where these do not apply, the change in price, unless a special agreement between the City and the Contractor as to prices is made at the time the changes are ordered, shall be calculated on the same basis as extra work.