**In re SAV–A–STOP INCORPORATED, Debtor.**

**SAV–A–STOP INCORPORATED, Plaintiff,**

v.

**MAYFAIR SUPER MARKETS, INC., Defendant.**

**Bankruptcy No. 87–830–BKC–3P1. Adv. No. 88–232.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Sept. 19, 1990.

---

David M. Wells, Jacksonville, Fla., for plaintiff.

E. Lanny Russell, Ronald Bergwerk, Jacksonville, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding came before the Court for trial on August 9, 1989, and on May 3, 1990, and upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. In 1984, plaintiff, Sav–A–Stop Incorporated ("SAS") was in the business of selling goods referred to as general merchandise ("GM") and health and beauty aids ("HABA") to retailers, generally supermarkets and convenience stores. Defendant, Mayfair Super Markets, Inc., ("Mayfair") is a retail supermarket chain offering to the public a full line of grocery items, frozen foods, dairy products, meats, produce, GM and HABA.

2. In July and August of 1984, Raymond Zager, an executive of SAS, and Stanley Kaufelt, Chairman of the Board and Chief Executive Officer of Mayfair, entered into negotiations for an exclusive business arrangement between their organizations. Zager and Kaufelt had been friends and business associates for many years. They negotiated a series of agreements under which SAS would become the exclusive supplier to Mayfair and SAS of GM and HABA. These agreements were known as (i) the Prepaid Rent Agreement, (ii) the Rack Installation Agreements, and (iii) Distributor–Reseller Working Stock Agreement.

3. On September 9, 1984, SAS and Mayfair entered into the Prepaid Rent Agreement, which provided that SAS would become Mayfair's exclusive supplier of specific items for a period of five years. Under the Prepaid Rent Agreement, SAS was required to make certain prepaid rent payments to Mayfair and to guarantee space for SAS's goods on Mayfair's shelves. In accordance with paragraph 3 of the agreement, SAS made an initial prepayment of $250,000 to Mayfair in 1984. The Prepaid Rent Agreement mandated the prepayment

amount to increase if Mayfair purchased more than $10 million of merchandise for the year and to be decreased if Mayfair's purchases did not reach this level. Accordingly, SAS made additional prepaid rent payments to Mayfair of $33,000.96 and $99,106.25 in August, 1985, and in August, 1986, respectively, based upon the increased volume of Mayfair purchases.

4. Paragraph 3(b) of the Prepaid Rent Agreement provided that the rent payments would be amortized over the five-year period of the agreement and that Mayfair was to return any unamortized portion of the prepaid rent in accordance with a five-year amortization schedule "if, for any reason, Mayfair should fail to continue to purchase the goods solely from SAS ... if, for any reason, SAS should cease to sell and supply the goods to Mayfair prior to the Rent Agreement's expiration." The original amortization schedule was attached as Exhibit "A" to the Prepaid Rent Agreement.

5. SAS and Mayfair also entered into Rack Installation Agreements ("RIA's") which required SAS to purchase and install various display racks in Mayfair's stores. Pursuant to the RIA's, SAS paid a third party to assemble the racks in Mayfair's stores. As set forth in the RIA's: "In and for the consideration of SAS commencing the Rack Placement Process, Retailer [Mayfair] agrees to reimburse SAS for the expenses and costs incurred by SAS in the Rack Placement Process. Such expenses and costs shall be paid to SAS ... within ten (10) days of the date on which SAS ceases to continue to do business, in the normal course, with Retailer [Mayfair]." Mayfair has retained these racks and has refused to pay SAS the unamortized value of the racks in accordance with the RIA's.

6. SAS and Mayfair also entered into the "Distributor–Reseller Working Stock Agreement" on October 14, 1985, (the "General Electric Agreement"). The General Electric Agreement set out the terms by which SAS would lend money to Mayfair for the purchase of an initial stock of light bulbs. SAS issued Mayfair a check in the amount of $34,594.00 of October 16, 1985, to pay for Mayfair's initial consignment of light bulbs. SAS and Mayfair are no longer operating pursuant to the General Electric Agreement, and the $34,594.00 is "repayable upon demand." Mayfair has not repaid any money to SAS in accordance with the General Electric Agreement. In recognition of the fact that SAS was merely advancing these amounts, paragraph 6 of the General Electric Agreement provides that "[o]n termination, Reseller [Mayfair] shall pay to Distributor [SAS] the full value of such stock."

7. This business relationship between Mayfair and SAS from 1984 through the first quarter of 1987 was excellent. Mayfair was a high priority customer and was given special treatment. In April and May, 1987, SAS began to experience increasing difficulty with its asset-based lender and cash-flow. It filed a Chapter 11 petition on May 29, 1987.

8. For a period of time while SAS re-established lines of supply, it experienced inventory problems. For this same period of time SAS was unable to supply all of Mayfair's needs. On May 21, 1987, just prior to SAS's bankruptcy filing, Mayfair began to purchase HABA and GM goods from a secondary supplier, P.J. Schmidt. Mayfair's store-level personnel were given authority to order directly from P.J. Schmidt to cover out-of-stocks. During the time SAS was experiencing inventory shortages, P.J. Schmidt was able to cover at least 95 percent of Mayfair's HABA and GM needs.

9. Beginning in mid-July, 1987, SAS began to improve its HABA and GM inventory situation. In recognition that Mayfair was one of its most important customers, SAS gave Mayfair special priority on all shipments. In addition, SAS made extraordinary efforts to deal with any Mayfair inventory problems. As a result of such efforts, and Mayfair's use of P.J. Schmidt as a secondary supplier, Mayfair's HABA and GM sales percentages remained constant.

10. Beginning in mid-July, however, Zager was involved in a political struggle at SAS and in early August, 1987, was forced to resign as Chief Executive Officer of

SAS. Zager immediately informed Kaufelt of this situation. This departure effected Mayfair's ultimate decision to terminate the SAS contracts.

11. Shortly after being informed that Zager had been replaced as Chief Executive Officer of SAS, Tony Petrillo, then President of Mayfair, demanded a meeting with the new head of SAS, James Hong, and the SAS manager in charge of the Mayfair account, Wallace Williams. On August 14, 1987, in response to Petrillo's demand, Hong and Williams flew to New Jersey to meet with Petrillo and other Mayfair employees.

12. At this meeting, Petrillo demanded that SAS pay Mayfair for alleged lost profits caused by its early summer, post-filing inventory problems. Kluxon, a vice-president of Mayfair, testified that Mayfair scheduled the meeting in order to get money from SAS. Mayfair and SAS reached a letter agreement on August 16, 1987, ("August Agreement").

13. Pursuant to the August Agreement, SAS agreed to pay Mayfair $256,000.00; $100,000.00 to be paid on or before August 28, 1987, and the balance within 90 days. Mayfair accepted this amount and made no other demands for lost profits or other damages at that time. SAS agreed to make the payment in order to insure that it would keep the Mayfair account and that Mayfair would be an exclusive sales source. In addition, SAS agreed to continue to improve its inventory situation and to reach satisfactory levels in HABA and GM by September 1, 1987, and September 15, 1987.

14. In accordance with the August Agreement, SAS paid $100,000.00 before August 28, 1987, and $130,000.00 on September 16, 1987, well before 90 days had passed. Mayfair terminated SAS before the final $26,000.00 was due and has not returned to SAS any portion of $230,000.00.

15. Following the August Agreement, SAS's inventory level continued to improve. SAS first improved the stock condition of its faster moving items. Although testimony on this point was contradictory, it is clear that SAS's service levels for September, 1987, through October, 1987, were close to the pre-filing optimal levels. The record contains no written complaints or other documentary evidence from the critical September, 1987, period to support Mayfair's contention that the inventory situation had not been satisfactorily improved by the salient dates. It is also clear that SAS placed greater emphasis on Mayfair's inventory situation. Two additional employees were added to work on the Mayfair account and in order to satisfy the extraordinary demands created by the opening of Mayfair's Cherry Hill store, SAS purchased goods at the retail level to meet Mayfair's needs.

16. On October 22, 1987, Petrillo orally informed Williams that SAS was terminated effective November 2, 1987. SAS was replaced that same day by P.J. Schmidt. Mayfair gave SAS no written notice. This violates the Prepaid Rent Agreement requirement of written notice of 90 days prior to termination.

17. During the business relationship between the parties, Mayfair received, but has not paid, $236,913.96 in goods from SAS.

18. Immediately after the termination, Mayfair recorded the following as liabilities: (1) the amount of prepaid rent it was obligated to return pursuant to the Rent Agreement; and (2) the cost of the merchandise received but not paid for.

### Conclusions of Law

I. SAS'S CLAIM AGAINST MAYFAIR FOR $236,913.96 FOR GOODS SOLD AND DELIVERED TO MAYFAIR

There is no dispute that Mayfair has not paid SAS $236,913.96 for goods sold and delivered. Mayfair admitted that SAS had delivered these goods to Mayfair and received statements for the merchandise. Mayfair admits that without the set-off Mayfair took for debts to a third party, Mayfair owes SAS $236,913.96 for goods delivered. Mayfair's only defense to payment of the $236,913.96 is set-off, which the Court rejects. These sums have been due and owing since November 2, 1987, and

SAS is entitled to pre-judgment interest of 12 percent from that date, the date the debt was liquidated, until the present. *Cioffe v. Morris*, 676 F.2d 539, 543 (11th Cir.1982); *Argonaut Ins. Co. v. May Plumbing*, 474 So.2d 212, 214 (Fla.1985); *Tech Corp. v. Permutit Company*, 321 So.2d 562, 563 (Fla. 4th DCA 1975).

## II. SAS'S CLAIMS AGAINST MAYFAIR UNDER THE GENERAL ELECTRIC AGREEMENT, THE RIA'S AND THE PREPAID RENT AGREEMENT

It is undisputed that SAS and Mayfair entered into the General Electric Agreement, the RIA's, and the Prepaid Rent Agreement. Under the unambiguous language, Mayfair owes SAS various amounts for SAS's out-of-pocket expenditures. The agreements are clear and must be enforced as written. *Quesada v. Director, Federal Emergency Management Agency*, 577 F.Supp. 695, 697 (S.D.Fla.1983).

### A. *The General Electric Agreement*

Under the terms of the General Electric Agreement, Mayfair should return the $34,-594.00 SAS lent to Mayfair at the beginning of the parties' business relationship. The full amount under the General Electric Agreement has been due and owing since November 2, 1987, and Mayfair owes SAS 12% pre-judgment interest from November 2, 1987 on this liquidated debt.

### B. *The RIA's*

The RIA's require Mayfair to return to SAS the unamortized value of racks SAS purchased for Mayfair at the inception of their business relationship. Under the terms of the RIA's, SAS is entitled to recover the unamortized portion of the racks. Nowhere in the RIA's is there any provision for a penalty or forfeiture if SAS terminates Mayfair. In any event, Mayfair's position that it can keep both the amortized and unamortized portion of the rack expense if SAS terminates Mayfair, and still keep the amortized portion of the rack expense if Mayfair terminated SAS, is unreasonable. In order for a liquidated damage clause to be controlling, it must be both *reasonable* and *unequivocal.* *Design Time v. Monco of Orlando*, 518 So.2d 454, 456 (Fla. 5th DCA 1988); *see also Orlando v. Murphy*, 84 F.2d 531 (5th Cir.), *cert. den.* 299 U.S. 580, 57 S.Ct. 45, 81 L.Ed. 427 (1936).

SAS has ceased to do business with Mayfair, thus Mayfair must repay SAS for the unamortized expenses and costs incurred by SAS, in accordance with the five-year amortization schedule contained in the RIA's. The unamortized value of the racks installed in Mayfair's stores under the RIA's is $48,489.73.. This amount has been due and owing since November 12, 1987, and prejudgment interest is due on this liquidated debt from that date. Under the terms of the RIA's, SAS may be entitled to recover attorneys' fees and costs because it was required to bring this suit to collect the amounts due under the RIA's. The Court declines to make any award for attorneys' fees and costs since evidence was not offered at trial.

### C. *The Prepaid Rent Agreement*

The terms of paragraph 3(b) of the Prepaid Rent Agreement require Mayfair to return the unamortized portion of the prepaid rent to SAS. Paragraph 3(b) provides that if the relationship is terminated by either party, for any reason, all that SAS is entitled to is the unamortized prepaid rent and all that Mayfair is entitled to is the amortized rent.

Mayfair treated the Prepaid Rent Agreement as requiring it to return the unamortized portion of the rent upon termination. On September 9, 1987, shortly prior to making his decision to terminate the relationship, Mr. Kaufelt sought and obtained from Michael Shapiro, a Mayfair employee, a written analysis of the Rent Agreement. That analysis states that SAS made an initial prepayment of $250,000, $33,000 in 1985, and $99,106 in 1986, and that those additional amounts were to be amortized from 1987 through 1991. In recognition of this fact, immediately after it terminated SAS, Mayfair entered the unamortized rent amount into its books as a debit/liability.

Mayfair contends that if it had breached its obligations under the Prepaid Rent Agreement and was terminated for cause by SAS, all it had to return was the unamortized portion, but that if SAS was terminated for cause, Mayfair could retain both the amortized and unamortized pre-payment. Mayfair's interpretation would produce an inequitable result, one that no reasonable person would have knowingly agreed to. Only if the contract was clear and unambiguous could the court read it to dictate such a result. *Bay Management v. Beau Monde*, 366 So.2d 788 (Fla. 2d DCA 1978); *Orlando v. Murphy*, 84 F.2d 531 (5th Cir.), *cert. den.* 299 U.S. 580, 57 S.Ct. 45, 81 L.Ed. 427 (1936).

Mayfair has also taken an inconsistent posture with regard to the forfeiture under the Prepaid Rent Agreement—it claims it can keep the unamortized rent as a form of liquidated damages and still keep the $230,000.00 it previously accepted for lost profits and collect additional amounts in this lawsuit from SAS for damages. The clause in the Prepaid Rent Agreement cannot be a liquidated damage clause if Mayfair can still sue for damages. *Kanter v. Safran*, 68 So.2d 553, 562 (Fla.1953); *see Hawk's Cay Investors v. Brandy Marine*, 524 So.2d 681, 684 (Fla. 4th DCA 1988); *Dade National Development v. Southeast Investments of Palm Beach County*, 471 So.2d 113 (Fla. 4th DCA 1985). In order for a liquidated damage clause to control, be enforceable, and not a penalty, it must be reasonable and unequivocal. *See Design Time v. Monco of Orlando*, 518 So.2d 454, 456 (Fla. 5th DCA 1988). If the clause was a valid liquidated damage clause, then Mayfair was limited in its recovery to that amount and must return the $230,000.00 previously recovered for "damages" and forfeit any damages claim. *Cf. Design Time*, at 456; *Ocean Dunes of Hutchinson v. Colangelo*, 463 So.2d 437, 439 (Fla. 4th DCA 1985); *Hall Construction v. Beynon*, 507 So.2d 1225, 1226 (Fla. 5th DCA 1987); *Hatcher v. Panama City Nursing Center*, 461 So.2d 288, 290 (Fla. 1st DCA 1985); *Greenstein v. Greenbrook, Ltd.*, 413 So.2d 842, 843–44 (Fla. 3d DCA 1982); *Brusko v. Circle of Seminole*, 436 So.2d 399, 400

(Fla. 2d DCA 1983). To allow Mayfair to retain both the prepaid rent, the previous $230,000 payment, and seek damages would constitute an unlawful penalty.

Mayfair concedes that the unamortized portion of the prepaid rent is $186,348.67. Accordingly, this amount has been due and owing since November 2, 1987, plus 12 percent pre-judgment interest on this liquidated debt.

## III. SAS'S CLAIM FOR LOST PROFITS

SAS seeks damages of $372,030.00 for lost profits based upon Mayfair's alleged failure to give 90 days notice of termination of applicable supply contracts. SAS's expert witness testifying to these damages stated that even though (i) SAS was losing money, (ii) selling goods below cost, and (iii) had itself identified Mayfair's account as unprofitable, that in the ninety days following termination, SAS lost over $350,000.00.

The Court finds the factual basis for this analysis unpersuasive. Testimony offered at trial was contradictory as to the SAS's reduction of overhead and "variable" costs. The lost profit analysis based upon an assumption of variable cost reduction of 32 percent in the first month, 40 percent in the second month, and 60 percent reduction in the third month. Examining the specific items that comprise variable costs show this assumption to be contrary to the evidence presented.

The cost analysis contained a category of "traceable expenses" which consisted of four subcategories: "field labor, field vehicles, field other, and transportation." These expenses were calculated under the assumption that they could only be reduced at the 32/40/60 percent rate. However, the evidence presented showed that the elements that make up each of these categories was quickly eliminated.

Evidence showed that field labor was eliminated almost immediately with the termination of the supply contract. The need for transportation was eliminated upon termination of the contract and according to the evidence, it took only approximately

two weeks to return the leased vehicles. The same applied to for field vehicle and field other expenses.

The lost profit analysis relied upon a 32/40/60 percent reduction rate, even though these important subcategories were all virtually eliminated within two weeks of termination of the contract. SAS's expert witness relied upon the 32/40/60 percent reduction rate as a matter of his judgment. The Court is unpersuaded by this judgment and finds the analysis to be flawed.

The lost profit analysis also contained a .5 percent debit for lost purchasing income or volume discounts. This was a compromise figure utilized by the expert witness in his calculations, but which fails to account for problems SAS was having in receiving such discounts that had nothing to do with the loss of the Mayfair supply contract.

The analysis also allocates fixed costs as a percentage of overhead, which was concededly not a very good analytical technique. Nonetheless, account service costs were included in common overhead even though Mayfair was a "no service" account and did not receive the in-store services that SAS provided to its other customers. Additionally, even though SAS would have had to finance inventory purchases by Mayfair through a credit line, the analysis did not include a credit for the interest expense that was avoided.

It is important to note that SAS knew the Mayfair account was unprofitable. In a memorandum to "customers, suppliers and associates" regarding the Mayfair termination, SAS's president wrote the following—

> We did lose a high-volume customer in the northeast. It was a wholesale account to which we provided no service. From a profit standpoint, the account was only marginal. After reanalyzing our costs, we discovered that we had been doing business with the account at a net loss. Without the account we can further reduce expenses and increase the operating profit.

SAS has not proven any damages or loss of profits resulting from the lack of 90 days notice by Mayfair of the termination of the supply contract.

## IV. MAYFAIR'S RIGHT TO SET–OFF FOR ADMINISTRATIVE EXPENSE PAID FOR AMOUNTS PAID TO TWIN COUNTY ON BEHALF OF SAS

■ Mayfair paid $96,000.00 to Twin County Grocers, Inc., ("Twin County") for publishing advertisements for goods SAS sold to Mayfair; $31,499.00 was paid for the publishing and was billed to SAS post-petition.

Although no written agreement memorialized the precise business relationship of the parties, SAS regularly paid for advertising done on its behalf by Twin County. As is customary in the industry, failure of SAS to pay for advertising caused the payment to fall on Mayfair. This advertising provided SAS a benefit. Mayfair is entitled to a claim for administrative expense of $31,499.00 as a credit against SAS's damages.

## V. MAYFAIR'S CLAIM FOR LOST PROFITS

■ Mayfair can only seek damages for September and October, 1987, since it has been compensated for the prior periods by the promise to pay $256,000.00 made in August, 1987. Mayfair claims that it is entitled to: (1) lost profits in the amount of $1,530,509.00; (2) $95,312.00 in expenses from using P.J. Schmidt as a secondary supplier; (3) $72,000.00 in additional prepaid rent payments under the Prepaid Rent Agreement; and (4) $26,000.00 in the form of a request for administrative expense, based upon SAS's failure to pay the full $256,000.00 under the August Agreement.

Mayfair is not entitled to any of these amounts. Mayfair breached the Prepaid Rent Agreement. Since SAS did not breach, Mayfair cannot recover for any lost sales because SAS did not cause any. *See Douglas Fertilizers & Chemical, Inc. v. McClung Landscaping, Inc.,* 459 So.2d 335, 336 (Fla. 5th DCA 1984); *Born v. Goldstein,* 450 So.2d 262 (Fla. 5th DCA 1984); *Dade County, Florida v. Palmer and Baker Engineers, Inc.,* 318 F.2d 18 (5th Cir.1963).

If SAS had breached the Prepaid Rent Agreement, Mayfair's claim for damages is governed by Chapter 672 of the Florida Statutes. Section 672.711 sets forth all buyer's remedies. Section 672.711(1) provides that: "where the seller fails to make delivery ... the buyer may cancel and: (a) 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or (b) recover damages for non-delivery as provided in this chapter (s. 672.-713)." Section 672.712 provides for cover. Thus, a buyer complaining of non-delivery can proceed under either §§ 672.712 or 672.713. Section 672.712(1) provides that a "buyer may cover by making in good faith and without reasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due the seller." Section 672.712(2) provides the measure of damages:

> The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (s. 672.715), but less expenses saved in consequence of the seller's breach.

Alternatively, a buyer may elect to proceed under § 672.713(1): "subject to the provisions of this chapter with respect to proof of market price (§ 672.723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and any consequential damages provided in this chapter (§ 672.715), but less expenses saved in consequence of the seller's breach." Essentially, both of these remedies involve the same computation, but under § 672.712, the cover price is conclusively determined to be the fair market price of the goods, whereas under § 672.713 the buyer has the burden of proving the market price.

Both sections provide the opportunity to seek consequential and incidental damages under § 672.715. Section 672.715(2) defines consequential damages as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise."

Applying these buyer's remedies to the case at bar, Mayfair's claim is without merit even if SAS breached the Prepaid Rent Agreement. First, Mayfair presented no evidence regarding market price whatsoever, so it cannot seek to recover under § 672.713. That leaves Section 672.712 as the only remedy. Section 672.712(1) requires an effort to purchase substitute goods in good faith and without unreasonable delay. Section 672.712(2) provides that the measure of damages is the difference between the contract price and the cover price, plus incidentals and consequentials. In order to recover consequential damages at all, Mayfair must show that the losses could not have been reasonably covered. Section 672.715(2). Mayfair has not established this evidence.

The evidence clearly showed that Mayfair already was using a secondary supplier on May 21, 1987. Mayfair admits that P.J. Schmidt supplied over 95 percent of any excess needs and that P.J. Schmidt's prices were as good or better than those of SAS. Any consequential damages that Mayfair may have suffered would have been due to Mayfair's failure to cover.

The evidence introduced by Mayfair with respect to its damages and out-of-stock situation in September, 1987, are after-the-fact reconstructions. These reconstructions attempt to show its out-of-stocks on HABA and GM for all of its stores during the 23–week period from May through November 1987. Mayfair reviewed SAS's invoices for one store, each week, in order to determine what SAS's warehouse out-of-stocks were during the 23–week period. The evidence presented shows that the exhibits are not accurate. The mistakes and differences cast doubt on the accuracy of the summaries provided by Mayfair. This is especially noteworthy in light of the fact that the back-up documents were not introduced to prove the accuracy of the summaries.

Mayfair's method of analysis of its alleged damages is flawed. Mayfair's dam-

ages analysis contains two faulty assumptions: (i) any reduction in average GM or HABA sales per customer was caused by SAS's out-of-stocks; (ii) any reduction in average GM and HABA sales per customer automatically resulted in a reduction in average sales of all items per customer.

Predicated upon these assumptions, Mayfair prepared its exhibit intending to show total average sales per customer were for the 21-week period prior to the Mayfair/SAS problems, the 23-week period during the problems, and the 22-week period afterward. Mayfair attributes the entire reduction of total average sales per customer to out-of-stock problems. Through such calculations Mayfair determined that it lost $1,530,509.00, in gross profits from September 1 through November 2, 1987.

However, Mayfair fails to consider and adjust for: (i) the admittedly slower summer sales months; (ii) lower sales in HABA AND .GM, as opposed to lower total average sales; (iii) other variables which impact on average HABA and GM sales per customer, as well as total average sales per customer; (iv) the out-of-stocks being covered by P.J. Schmidt.

Mayfair admitted that its lost profits claim is based on gross profit margins while his net margin is 2.2 percent. If the claim was based on net profit, it would be $120,000. Mayfair also admitted that it did not take into consideration all variable costs. A buyer cannot recover his gross profits under Chapter 672, Fla.Stats. § 672.708(2) is uniquely a seller's remedy.

Similarly, Mayfair's claim that it lost dollars because of loss of the volume discount SAS gave Mayfair on items (1 percent on GM and HABA and 3 percent on cosmetics) is not supported by the evidence. There was no analysis by Mayfair of whether the prices charged by P.J. Schmidt were higher or lower than buying the same goods from SAS, even with a rebate. Based upon the evidence presented, it appears that P.J. Schmidt's goods were obtained at a lower price.

With regard to the $95,312.00 Mayfair seeks as expense in having to use P.J. Schmidt, it is clear that the sum is based on

23-week period. Despite Mayfair's acceptance of $230,000.00 for such damages pursuant to the August Agreement. Mayfair cannot make a claim for these damages for more than the 9-week period from September 1, 1987, to November 2, 1987, and it offered no evidence as to what those costs would be.

Mayfair also claimed that SAS owes Mayfair $72,000.00 in additional prepaid rent under the Prepaid Rent Agreement for the year from August, 1986, to August, 1987. Mayfair's claim is without merit. First, Mayfair failed to present any actual figures substantiating the amount of their actual purchases during the relevant time period. Second, any amount that would be due under the Prepaid Rent Agreement would·be amortized over five years and would have been refunded to SAS under the Prepaid Rent Agreement in November, 1987.

Finally, with regard to SAS's failure to pay the final $26,000.00 under the August Agreement, SAS met its obligations under the agreement and was terminated by Mayfair before final payment was due.

Accordingly, Mayfair is not entitled to recover any amounts from SAS pursuant to its counterclaim and is only entitled to $31,498.00 as an administrative expense for advertising payments made to Twin County.

*Conclusion*

Based on the foregoing reasons, SAS is entitled to judgment for the following:

| | |
|---|---|
| Merchandise Sold and Delivered | $236,913.96 |
| Repayment of Loan Under General Electric Agreement | 34,594.00 |
| Unamortized Rack Installation Costs | 48,489.73 |
| Unamortized Portion of the Prepaid Rent | 186,348.67 |
| Interest (12% from November 2, 1987 until July 3, 1990) | 162,030.84 |
| Total Contractual Damages | 668,377.20 |
| Less Administrative Expense | 31,498.00 |
| Total Due and Owing SAS | $636,879.20 |

The Court will enter a separate final judgment.