**In re SECTION 20 LAND GROUP, LTD., Eagle Develop. of S.W. Florida, Inc., Twin Eagles Dev. Co., Inc., Twin Eagles Golf & C.C., Inc., V.V.V. Holdings Company, Inc., Twin Eagles Land Group I, LLC, Debtors.**

Nos. 99–14697–9P1, 99–14699–9P1, 99–14702–9P1, 99–14703–9P1, 99–14705–9P1, 99–14709–9P1.

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

Oct. 19, 2000.

Steven M. Berman, Morse, Berman & Gomez, P.A., Tampa, FL, for Debtors.

Roberta A. Colton, Tampa, FL, for Applicant.

Michael C. Markham, Johnson, Blakely, Pope, Bokor Etal, Clearwater, FL, for Creditors Committee.

### ORDER ON IMG WORLDWIDE, INC.'S MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM (DOC. NO. 500)

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration in these confirmed Chapter 11 cases is IMG Worldwide, Inc.'s (IMG) Motion for Allowance of Administrative Expense Claim, seeking the allowance of an administrative claim in the amount of $495,595.76. The Court reviewed the Motion and the record, heard testimony of witnesses and argument of counsel and now finds and concludes as follows:

On September 9, 1999, Twin Eagles Golf & Country Club, Inc. (Golf & Country Club) and five related entities filed voluntary Petitions under Chapter 11 of the

United States Bankruptcy Code. Related entity, Talon Land Group, Ltd., filed its Petition on October 19, 1999. At the time of the filing, the Debtors owned various interests in approximately 1,374 acres of land, together with certain improvements thereon, located in Naples, Collier County, Florida. Golf & Country Club owns an 18–hole championship golf course that was co-designed by Jack Nicklaus and his son, Jack II, and a clubhouse. The construction of both the Golf Course and the clubhouse was not completed at the time of the filing.

IMG is an entity that represents athletes and stages and promotes athletic events worldwide. They own and promote a number of golf tournaments including what is known as the Father/Son Challenge. Golf courses that host IMG tournaments pay a site fee and bid to host televised events.

Pre-petition, on March 16, 1998, Golf & Country Club entered into a contract (Contract) with IMG, formerly known as International Management, Inc. (IMG Exh. 2) Pursuant to the Contract, as amended by a letter agreement dated July 30, 1998, IMG was to stage and promote a golf tournament known as the "Father/Son Challenge" at the Golf Course in the years of 1999, 2000, 2001, 2002 and 2003 (IMG Exh. 2). Prior to 1999, IMG promoted and staged tournaments for several years at several other golf courses in Florida.

The Contract expressly provided that Golf & Country Club would receive the following benefits in connection with each annual tournament at the Golf Course: (1) designation as the official site of the Tournament; (2) the right to advertise and promote its association with the Tournament; (3) inclusion of TwinEagles' name in the title of the Tournament; (4) identification of TwinEagles during the telecast of the Tournament; (5) four hours of televi-

sion coverage on NBC; (6) identification of the Golf Course in promotional materials; (7) a media day hosted by IMG at the Golf Course; (8) exclusive rights to conduct, collect and retain all revenues from clubhouse pro shop operations and clubhouse food and beverage operations; (9) the right to establish concession stands in the clubhouse and on the golf course for the sale of pro shop merchandise; (10) fifty clubhouse passes for each day of the Tournament; (11) four Pro–Am Tournament playing spots; and (12) ten invitations for two to attend the draw party and awards dinner.

The Contract further provides that in return for the foregoing, IMG would be paid an annual site fee as follows: $425,000.00 in 1999; $450,000.00 in 2000; $500,000.00 in 2001; $500,000.00 in 2002 and $600,000.00 in 2003. Each site fee was due prior to the date of each tournament. In addition, Golf & Country Club was required to provide all food and beverages to be served at the Pro–Am draw party, volunteer lunches and the player's hospitality room at a cost not to exceed $20,000.00. Furthermore, IMG would receive 5% or $25,000.00, whichever is greater, in ticket revenues generated for an agreed upon charity.

In fact, the importance and the critical need for staging the tournament, urged by Golf and Country Club in seeking approval of a DIP financing played a major, if not primary, reason for approving the DIP financing, which by no means went without challenge by some parties of interest.

The tournament was held as scheduled with the participation of nationally known golfers. The total prize money was $860,000.00. It was the responsibility of IMG to procure the prize money through sponsorship. It was also the responsibility of IMG to cover the promotional and staging costs associated with the tournament.

The tournament received very substantial media coverage and national exposure through four hours and forty-five minutes of broadcast by NBC. The bulk of the services and the work provided by IMG was done post-petition and all invoices submitted represent expenses incurred post-petition. Since none of the required payments had been made, the parties met on December 1, 1999, post-petition and one week before the commencement of the tournament, to discuss the default under the contract. IMG was fully aware of the precarious financial condition of the Debtors including the Golf & Country Club; that it was surviving only on post-petition financing and its opportunity to survive was seriously threatened by the still pending litigation with the Wild Life Federation of Florida and the Audubon Society.

As the result of intense discussion by the parties IMG agreed to accept and Golf & Country Club consented to a deferred payment of the site fee. Under the agreement hammered out at the December 1st meeting, the Golf & Country Club was to pay the expenses within 90 days and repay the initial site fee in four equal annual installments. It is without dispute that there was no agreement at the December meeting as to the amount of the reimbursable expenses. Although it is now conceded by Golf & Country Club that out of the total of $95,595.76, at least $55,000 is proper and should be paid.

During the pendency of these Chapter 11 cases, Golf & Country Club did not file a motion to assume or reject the Contract with IMG. Golf & Country Club did continue to work with IMG in staging the Tournament and the Tournament took place as scheduled during the week of December 3, 1999. It is without dispute that the bulk of the services and work performed by IMG were performed post-petition. It is also without dispute that the Debtor re-ceived the items listed as benefits under the Contract. In fact, the national television coverage on NBC lasted forty-five minutes longer than provided for in the Contract.

Golf & Country Club did not pay IMG the amounts due under the Contract with the exception of the initial $25,000.00 payment.

The Contract was neither assumed nor rejected until the Plan of Reorganization was ultimately confirmed on August 15, 2000. The confirmed plan provided that all executory contracts not assumed are deemed to be rejected.

On April 14, 2000, IMG filed the instant Application. IMG seeks the allowance of its administrative claim in the amount of $495,595.76. The claim is comprised of the site fee in the amount of $425,000.00 less $25,000.00 that was paid by Golf & Country Club, plus necessary expenses in the amount of $95,595.76, itemized as follows:

| | |
|---|---|
| Satellite Dishes | $ 2,544.00 |
| Twin Eagles Hospitality Tent | 6,365.45 |
| Office Depot Hospitality Tent | 10,841.25 |
| Media Tent | 9,353.55 |
| Pro–Am Locker room Trailer | 1,194.17 |
| Office Depot Office Trailer & Tournament Office Trailer | 3,640.53 |
| Draw party, volunteer lunches, etc. | 20,000.00 |
| Power requirements (generators) | 16,500.00 |
| Executive Restroom Trailers | 8,374.00 |
| Flowers, Fence, etc. for Tent City | 2,500.00 |
| Carpenter for the Stairs of OD Hosp. | 5,947.53 |
| Seven Golf Carts | 2,400.00 |
| Phones | 4,600.00 |
| Mulch for Tent City (1/2 cost) | 826.80 |
| Lights for operations at night | 508.48 |
| TOTAL EXPENSES: | $95,595.76 |

Pursuant to 11 U.S.C. § 503(b)(1)(A), these are the facts relevant and germane to the viability of IMG's request for an allowance of an administration cost of $495,595.76 as the reasonable value of the

services rendered to Golf & Country Club post-petition.

Golf & Country Club objects to the allowance of this claim, contending that the Contract, upon which the claim of IMG is based, was breached by the Debtor pre-petition and that since the Debtor never assumed the Contract, IMG's claim is merely a general unsecured claim. Further, Golf & Country Club contends that the services provided by IMG did not provide a substantial benefit to the estate; therefore, the claim should not be allowed as an administrative expense under § 503(b)(1)(A).

IMG, on the other hand, contends that although pre-petition the Debtor was in default of the Contract for nonpayment, the Contract was still executory because IMG, the non-defaulting party, did not terminate the Contract by written notification as required by the Contract. IMG contends that although the Debtor never assumed the Contract, the services provided by IMG substantially benefited the estate. IMG contends that it agreed that the Debtor could postpone the payment of the site fee in an effort to work with the Debtor as the Debtor proceeded through the reorganization process by accepting payment over time.

It should be noted at the outset what is and what is not involved and relevant to the matter before this Court. Although the genesis of the claim of IMG is based on contract, the request of IMG, the matter under consideration, is not to recover damages for breach of contract by Golf & Country Club but to be compensated for the reasonable value of the services performed for the purpose of preserving the estate. Thus, whether the Contract was breached or not pre-petition or remained executory and rejected only with the Order of Confirmation is of no consequence. Even assuming that the lease, and in this

instance the Contract, and its rejection is relevant, the rent fixed by the lease accrued is entitled to administrative rent priority for the contract amount until the date the contract is rejected. *In re Pacific— Atlantic Trading Co.,* 27 F.3d 401 (9th Cir.1994); *In re Thinking Machines Corp.,* 67 F.3d 1021 (1st Cir.1995). Even a claim arising from a breach or rejection of an assumed executory contract constitutes an administrative expense to the extent the contract conferred actual benefit to the estate. *In re Stewart Foods,* 64 F.3d 141 (4th Cir.1995).

What is involved here is a request for payment of administrative expenses pursuant to Section 503(b)(1)(A) which has nothing to do with the breach vel non of the Contract by Golf & Country Club. The ultimate question is whether the request under consideration by IMG qualifies for an administrative claim treatment and if so, in what amount.

Section 503 of the Bankruptcy Code defines an administrative expense as "the actual, necessary costs and expenses of preserving the estate including wages, salaries, commissions for services rendered after the commencement of the case." To establish entitlement to an administrative expense claim, claimant must show that the claim arose from a post-petition transaction and that the transaction actually benefited the estate. *In re Finevest Foods, Inc.,* 159 B.R. 972, 975 (Bankr. M.D.Fla.1993). *See In re Sav–A–Stop, Inc.,* 119 B.R. 317 (Bankr.M.D.Fla.1990) (concluding that grocery store which paid for publishing advertisements on behalf of the debtor supplier was entitled to recover advertising costs as an administrative expense). A claim will be afforded priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of

the business. *In re Chateaugay Corp.*, 10 F.3d 944, 956 (2nd Cir.1993) (focusing on whether or not the creditor provided benefit to the debtors-in-possession post-petition).

 Administrative expenses under Section 503 "should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors." *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1377 (11th Cir.1994). An administrative expense claimant has the burden of proving that either the debtor-in-possession incurred the transaction on which the claim is based or that the claimant furnished consideration to the debtor-in-possession and that the transaction resulted in a direct benefit to the debtor-in-possession. Consideration is furnished to the estate only where the debtor-in-possession induces post-petition performance or where the performance on a contract not rejected by the debtor-in-possession is rendered to the estate. *In re CIS Corp.*, 142 B.R. 640, 643 (S.D.N.Y.1992). Generally, where there is a pre-petition breach, the creditor is not entitled to an administrative expense claim. *In re Central Florida Metal Fabrication, Inc.*, 190 B.R. 119 (Bankr.N.D.Fla.1995). A debtor may sometimes incur priority expenses under an executory contract even without an express election to assume the lease, if the bankruptcy estate derives benefit under the contract. *See In re Chateaugay Corp.*, 10 F.3d 944, 955 (2nd Cir.1993); *see e.g. In re Florida West Gateway, Inc.*, 180 B.R. 299 (Bankr.S.D.Fla.1995).

 After commencement of the Chapter 11 case, the parties met. The Debtor had not paid IMG the amounts due under the Contract. The Debtor agreed to pay the 1999 site fee in four annual installments of $100,000, and the reimbursable expenses were to be paid by the Debtor within ninety days of the Tournament.

This negotiation was a post-petition transaction providing new value to the bankruptcy estate. Golf & Country Club encouraged IMG to proceed with the tournament and assured IMG that it would be paid the site fee and would be reimbursed its expenses.

Golf & Country Club argue that the Tournament provided no benefit to the estate because no home lots or golf memberships were sold as a direct result of the Tournament. However, this argument is at most a red herring on the part of the Debtors. It is a basically accepted proposition that concrete results from promotion or advertising is difficult or at times impossible to quantify in translating to dollars and cents. It is especially true of their promoting nationally televised sporting events for which advertisers pay huge amounts of money no doubt because they're so commercial. These such expenses are productive even though the result cannot be measured by dollar amounts. While it is true that rating services do measure the number of viewers, in the present instance one cannot deny that the national exposure of prime time television provided a very significant national recognition to the Golf & Country Club. *See In re Sav–A–Stop, Inc.*, 119 B.R. 317 (Bankr.M.D.Fla.1990) (concluding without discussion that advertising provided a benefit). Moreover, the fact that they did not sell any lots as a direct result of the marketing is a non sequitur in that Golf & Country Club had no lots to sell. The lots were owned by another entity. And the record indicates approximately three golf memberships worth on average $120,000.00 were sold as a result of the Tournament.

IMG states that the benefits were that the name "TwinEagles" was made part of the Father/Son Tournament's name, NBC made special vignettes about TwinEagles

that were televised, and that the Golf Course was given four hours and forty-five minutes of national exposure due to the televising of the Tournament. In addition, IMG gave to TwinEagles certain marketing rights that would normally only be given to important clients. These items consist of media day, owner benefits, fifty clubhouse badges and four professional/amateur spots in the Tournament. (See IMG Exh. 4G, 4H, and 4J). The precise measure of benefits that Golf & Country Club received from IMG's services is difficult to quantify. However, this does not matter.

Golf & Country Club's principal goal in entering into the Contract was to obtain national exposure for the Golf Course. The Debtor's president admitted that the Tournament was a "material" aspect of Golf & Country Club's Golf Course and that all of the potential purchasers of the golf course were aware of and favorably impressed by the Tournament. Golf & Country Club's secured lenders supported Golf & Country Club's use of the funds from the post-petition financing to permit the Debtor to finish the Golf Course in time for the Tournament. Further, Golf & Country Club intentionally chose not to move to reject the Contract in order to preserve the option of assuming the Contract for the benefit of any potential purchaser of the Golf Course.

Having induced IMG to perform and willingly accept the benefits thereof, the Debtor is now estopped to deny that administrative claim status to IMG. *See e.g. In re Carpet Center Leasing, Inc.,* 991 F.2d 682, 686 (11th Cir.1993). Having concluded that IMG is entitled to an allowance of an administrative claim pursuant to § 503(b)(1)(A), this leaves for consideration the determination of the amount of the value of the services rendered and the amount of expenses reasonably incurred by IMG in connection with staging the tournament.

■ Ordinarily in considering administrative rent for a claim for post-petition use and occupancy of the premises by the debtor, the amount fixed by the lease is presumed to represent the reasonable value of the use and occupancy of the premises. *In re Litho Specialties, Inc.,* 154 B.R. 733, 740 (D.Minn.1993). Thus, unless credible evidence is presented to overcome this presumption, the award of the amount fixed by the lease is appropriate. *Id.*

■ In relation to our case then, the Contract established that the site fee was to be $425,000, $25,000 of which was paid by the Debtor. Golf & Country Club presented no evidence to overcome the rebuttable presumption. No evidence was presented to rebut the presumption that this was the reasonable value of a site fee for a tournament of this type. Rather, evidence was presented by IMG that another golf course in Orlando offered to pay a $750,000.00 site fee to host the same Father/Son Tournament and that IMG receives up to $1.0 million site fees for other similar tournaments that it stages. The evidence has shown that $425,000.00 is a reasonable site fee and is a reasonable measure of the value of services provided by IMG. Furthermore, the evidence has shown the post-petition expenses of $95,595.76 incurred by IMG were actual costs which substantially benefited the estate.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that IMG Worldwide, Inc.'s Motion for Allowance of Administrative Expense Claim be, and the same is hereby, granted, and IMG Worldwide, Inc., is

hereby allowed an administrative claim in the amount of $495,595.76.